UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSOLIDATED RAIL
CORPORATION,

|  |  |
|---|---|
| Plaintiff, | Case No. 2:15-cv-12828 |
|  | District Judge Victoria A. Roberts |
|  | Magistrate Judge Anthony P. Patti |
| v. |  |
| WEST JEFFERSON RAILROAD COMPANY, |  |
| Defendant. |  |

_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART CONRAIL'S MOTION FOR SUMMARY JUDGMENT (DE 31) AND TO GRANT IN PART AND DENY IN PART WEST JEFFERSON'S MOTION FOR SUMMARY JUDGMENT (DE 27)

**I.  RECOMMENDATION**:  The Court should grant in part and deny in part

the parties' cross motions for summary judgment because genuine issues of

material fact remain on which a reasonable factfinder could return a verdict for

either party.

**II.  REPORT**

### A.  Background

#### 1.  Factual Background

Plaintiff, Consolidated Rail Corporation ("Conrail"), brings this action

against Defendant, West Jefferson Railroad Company ("WJRC"), seeking to quiet

title, or alternatively, an action for declaratory judgment related to a spur track (the "Spur") and elevated bridge, linking Conrail's main north/south rail lines to the former McLouth Steel facility (the "Facility").

The Facility is located at 1491 West Jefferson Avenue in Trenton, Michigan, and operated as a fully integrated steel-making plant from 1948-1996. In 1954, McLouth purchased "approximately eleven acres of property located at the Southwest corner of W. Jefferson Avenue and King Road," in Trenton, Michigan, in order to "permit a spur track and overpass at West Jefferson Avenue to be constructed from the New York Central Railroad ("NY Central") to the southern end" of the Facility property.[1] (DE 27-1 at 11.) In addition, one-half of the property was to be "sold to the New York Central Railroad,[2] who [would] construct the spur track and the overpass." (Id.) When complete, the Spur linked the Facility to a rail corridor to the west, connected to a main line belonging to the Canadian National Railway ("CN"). (DE 27-1 at 24.)

According to a 1963 Agreement between NY Central and Detroit, Toledo, & Ironton Railroad Company ("Ironton"), NY Central constructed the Spur and bridge, which was then valued at $306,094.37. (DE 31-10.) Construction was completed in 1954 or 1955, around the same time as was the construction of

---

[1] Throughout this Report and Recommendation, the property on which the Spur sits will be referred to as the "subject property."

[2] New York Central Railroad is Conrail's predecessor in interest.

McLouth's first blast furnace.  (DE 37-2 at 14.) A blast furnace melts raw materials to make iron, which is then processed into steel.  (Id. at 22-25, 53-54.) McLouth's blast furnace was fueled with coke, which was hauled in by Conrail and other carriers using the Spur.  (Id. at 24.)  Likewise, the carriers hauling away the steel frequently utilized the Spur.  (DE 32-1 at 3-4.) On April 18, 1963, Conrail entered into an agreement with Ironton to share costs arising out of the sidetrack. (DE 31-10.)  McLouth was not a party to the agreement.

At some point after 1968, a document was drafted purporting to grant Conrail an easement over the Spur (the "Draft Agreement").  (DE 32-4.)  However, the document was not signed or dated by Conrail, any of its predecessors, or McLouth, and it is unclear who drafted it.  (DE 27-1 at 33.)

McLouth first filed for Chapter 11 bankruptcy in 1981, selling its assets to McLouth Steel Products Corporation ("Products") by a warranty deed.  (DE 33-5.) Per the bankruptcy court order, the sale of McLouth's assets was to be made "free & clear of liens."  (DE 27-2 at 88.)

Products operated the Facility until it too filed for Chapter 11 bankruptcy in 1995.  (DE 27-7 at 2.)  Conrail appeared in the 1995 bankruptcy but did not assert any interest in the subject property or object to its sale.  (Id. at 7.)  In 1996, the subject property was conveyed to Detroit Steel Company ("DSC") via quit claim deed.  (DE 37-2 at 7.)  In 1997, DSC sold the subject property to Cleveland Cliffs

Iron Company, conveying "all of the estate, right, title, interest, claim or demand whatsoever," including "improvements, hereditaments and appurtenances." (DE 27-7 at 50-52.) Cleveland Cliffs promptly conveyed the subject property to Fritz Enterprises, Inc. ("Fritz") through a September 25, 1998 limited warranty deed, which conveyed "all of [its] right, title and interest . . . together with all tenements, hereditaments, and appurtenances thereunto belonging to or in any wise appertaining." (DE 27-7 at 54.)

Fritz then performed a "massive cleanup" of the Facility, and shipped its scrap over the Spur until 1999.[3] (Id. at 23-24.) From 1999 to 2003, Conrail used the Spur to make shipments of coiled steel to the Facility, and to place cars at the Facility for outbound shipments. (DE 37-2 at 20 and 32-6 at 10.)

WJRC was incorporated in 2012 pursuant to the Railroad Code of 1993 ("Railroad Code") as a "Domestic Profit Railroad Corporation." Mich. Comp. Laws §§ 462.101 *et seq.*; (DE 27-8 at 98-101.) WJRC owns no locomotives, railcars, or track maintenance equipment. (DE 64 at § I, ¶ 12.) Although it was incorporated in 2012, it has thus far never engaged in operations of any kind, does not have a business plan, does not generate revenue, and has no customers. (Id. at § II ¶ 31, DE 34-7 at 8.) It has never used the Spur track. (DE 34-7 at 10.) In

_____

[3] Robert E. Wright, a blast engineer at the Facility, testified that it was DSC that did the cleanup. However, the relevant evidence indicates that Fritz owned the property during this time. (DE 37-2 at 18.)

2013, Fritz conveyed the subject property to WJRC.  (DE 27-8 at 99.)  In 2014, WJRC disputed Conrail's assertion that it possessed rights to use the Spur, leading to the current lawsuit.  (DE 27-8 at 109-113.)

## 2. Procedural Background

The parties filed cross-motions for summary judgment on November 29, 2016, each asserting that it was entitled to summary judgment on some or all of the contested issues.  The matter came before me for a hearing on April 20, 2017, at which counsel for both parties appeared. On May 9, 2017, I accompanied the parties in walking the Spur, in order to familiarize myself with the track and property at issue.

On June 2, 2017, the parties prepared a joint list of disputed and undisputed material facts, a 46-page document outlining the material facts that are not in dispute (7 pages), and those that are in dispute (39 pages), which included citations to the summary judgment evidence supporting their respective assertions.  (DE 64.)[4]  Specifically, Conrail identifies 15 and WJRC identifies 33 undisputed facts. As to disputed material facts, Conrail identifies 48 and WJRC identifies 60.  (Id.) As may not be surprising from the fact that the parties dispute a substantial number of material facts and point to conflicting evidence in the summary judgment record to support those contentions, my report is that there exist genuine disputes of

---

[4] This led to additional motion practice in the form of Conrail's motion to strike (DE 66), which I addressed via separate order. (DE 70.)

material fact and I accordingly recommend that neither party be granted all of the relief that it seeks at this stage.

**B.    Standard**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e) (2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving

party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted). Summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 371, 322-23 (1986)).

## C. <u>Discussion</u>

Conrail and WJRC have filed cross motions for summary judgment, each asserting that it is entitled to judgment as a matter of law on some or all of the contested issues. I will address each argument in turn.

### 1. Hostile Use Theory

#### a. Conrail Pleaded a Hostile Use Theory.

Conrail first argues that it is entitled to summary judgment on its action to quiet title because it has established a prescriptive easement through its open,

notorious, adverse, and continuous use of the track at issue (the "Spur"). WJRC counters that the Court should disregard this argument entirely because it relies on a theory not alleged in its complaint. Specifically, WJRC asserts that it was not sufficiently put on notice of Conrail's hostile use argument, and was therefore unable to conduct sufficient discovery on this issue. It relies on two Sixth Circuit cases to support its position: *Yanovich v. Zimmer Austin*, 255 F. App'x 957 (6th Cir. 2007), in which the court held that a party "is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories." *Id*. at 970 (internal quotation omitted); and *Tucker v. Union of Needletrades, Indus., & Textile Emp.*, 407 F.3d 784 (6th Cir. 2005), in which the court held that permitting a plaintiff to raise a new claim at the motion for summary judgment stage would "subject defendants to unfair surprise." *Id.* at 788.

Conrail counters that it appropriately pleaded its claim for quiet title, and is advancing not a separate claim, but one of two potential theories that can establish that claim. Conrail likens it to the situation in *Wysong v. Dow Chem. Co.*, 503 F.3d 441 (6th Cir. 2007), which is instructive. There, the plaintiff pleaded her retaliation claim under the Family and Medical Leave Act ("FMLA"), which provides recovery under theories of both interference and retaliation. In her

motion for summary judgment, the plaintiff set forth an interference-theory argument, which the district court rejected, because her complaint merely alleged a "claim" of retaliation.  The Sixth Circuit found the district court's approach to be "overly rigid," because the plaintiff did not allege a new *claim*, but merely a new *theory* under her original FMLA retaliation claim.  Thus, the question is whether Conrail's hostile use argument is a separate claim or merely one theory to prove its quiet title claim.

Here, Conrail's complaint sets forth a claim to quiet title, which quotes Restatement of Property 3d's explanation of prescriptive easements.  (DE 1 at ¶¶ 39-42.)  To be sure, the complaint does not explicitly state "hostile use," but it does explain that a prescriptive easement may be established either by: (1) a use adverse to the owner; or, (2) an intended but imperfectly created servitude.  (Id. at ¶ 40.) Under the adverse use theory, "[a]n easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years."  *Plymouth Canton Cmty. Crier, Inc. v. Prose*, 242 Mich. App. 676, 679 (2000).  The terms *hostile* and *adverse* are used interchangeably in this context.  *Id.* at 681. As Conrail's claim to quiet title can be established by at least two different theories, its hostile use argument is not an entirely separate *claim*, but merely one of the theories by which a prescriptive easement can be established. Consistent with the published opinion in *Wysong*, it would be "overly rigid" to

9

construe Conrail's complaint as only pleading a claim for prescriptive easement by an intended but imperfectly created servitude.  In light of Conrail's specific mention of prescriptive easements being established either by an intended but imperfectly created servitude or "a use that is adverse to the owner of the land or the interest in land," WJRC was adequately put on notice that Conrail might proceed under this latter theory.  (DE 1 at ¶ 40.)

Moreover, despite WJRC's arguments to the contrary, there is no indication that it was prejudiced by Conrail's hostile use argument.  According to the parties' joint proposed discovery plan, discovery was needed on issues including "the construction and maintenance of the track at issue (the "Spur")," and "prior use (and non-use) of the Spur," all of which are related to a theory of hostile use. Likewise, WJRC deposed witnesses regarding Conrail's use and maintenance of the Spur.  (*See, e.g.,* DE 52-2 at 87, DE 64, § 1, ¶¶ 9-11.)  Accordingly, I do not see a reason for the Court to preclude Plaintiff's argument that it has established a prescriptive easement through a hostile use theory.

### b.    Burden of Proof

The parties next dispute the appropriate burden of proof for establishing the existence of an easement by prescription.  Conrail asserts that, although typically the burden of proving the elements of a prescriptive easement lies with the plaintiff, where there is "open, notorious, and continuous use for a period of

decades," there is a conclusive presumption of a right of use, which shifts the burden of proof to the party opposing the easement. WJRC disputes this reading, arguing that the burden of proof remains with the plaintiff, but that the defendant must respond with evidence at trial.

An examination of the cases cited by both parties is helpful. Conrail relies on *Beechler v. Byerly*, 302 Mich. 79 (1942), which involved a dispute between owners of adjoining property over the ability of the defendant to remove a staircase, which would allow only one access to the plaintiff's building. The Court quoted a 1901 case from the New Jersey Court of Errors and Appeals, noting the following:

> "It has been held that the open, notorious, continuous, and adverse use across the land of another from a residence or place of business to a public road for more than 20 years affords a conclusive presumption of a written grant of such way [internal quotation omitted], and that, when the passway has been used for something like a half century, it is unnecessary to show by positive testimony that the use was claimed as a matter of right, but that after such user the burden is on the plaintiff to show that the use was only permissive."

*Beechler*, 302 Mich. at 83 (quoting *Clement v. Bettle*, 65 N.J.L. 675 (1901)).

The holding in *Beechler* was much later clarified in *Widmayer v. Leonard*, 422 Mich. 280 (1985), which explained:

> The burden of proving a prescriptive easement remained throughout trial with plaintiffs. Once Plaintiffs presented evidence that they had used the disputed land for over fifty years, the burden of *producing evidence* shifted to defendants to establish that plaintiffs' use was permissive.

*Id.* at 290 (emphasis added).  Thus, the burden of *proof* remains at all times with

the plaintiffs, whereas the burden of *production* shifts to the defendants after

plaintiffs have produced evidence that they used the land for fifteen years or more.[5]

*Killips v. Mannisto*, 244 Mich. App. 256, 258 (2001) (clarifying that the *Widmayer*

case "clearly states that the burden of proof remains on the plaintiff during the

trial.").  More specifically, "the plaintiff bears the burden to demonstrate

entitlement to a prescriptive easement by clear and cogent evidence."  *Matthews v.*

*Nat. Res. Dep't*, 288 Mich. App. 23, 37 (2010).  "A prescriptive easement requires

elements similar to adverse possession, except exclusivity."  *Id.*  Clear and cogent

evidence "is more than a preponderance of evidence, approaching the level of

proof beyond a reasonable doubt."  *McQueen v. Black*, 168 Mich. App. 641, 645

(1988).  In the instant matter, therefore, it is Conrail's burden to prove by clear and

cogent evidence that it its use of the Spur was open, notorious, adverse, and

continuous for a period of fifteen years.  *Prose*, 242 Mich. App. at 679; *Matthews*,

288 Mich. App. at 37.  If Conrail can present evidence that it made open,

---

[5] The burden of proof is broader than the burden of production and includes both
production and persuasion.  *Black's Law Dictionary* 236 (10th ed. 2014).  The
burden of proof therefore encompasses both the "burden of producing evidence,
satisfactory to the judge, of a particular fact in issue" and the burden of
"persuading the trier of fact that the alleged fact is true."  KENNETH S. BROUN,
MCCORMICK ON EVIDENCE  § 336 at 644, 7th ed. 2013. The burden of persuasion
"becomes a crucial factor only if the parties have sustained their burdens of
producing evidence and only *when all of the evidence has been introduced*."  Id. at
645 (emphasis added).

notorious, adverse, and continuous use of the Spur for over fifteen years, then WJRC must produce evidence that the use was permissive and not adverse. Here, I conclude that Conrail has produced some evidence—albeit not at this stage "clear and cogent" and certainly not "approaching the level of proof beyond a reasonable doubt"—that could establish an easement by prescription, and that WJRC has responded with contrary evidence, thus making a grant of summary judgment improper.

### c. Prescriptive Easement – 1954 to 2003.

Conrail asserts that its use of the Spur was open, notorious, adverse, and continuous from 1954-2003. To meet this standard, Conrail's use must have been:

> so open, visible and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally and with a purpose to assert a claim of title adversely to his, or so patent that the owner could not be deceived, and such that if he remains in ignorance it is his own fault.

*Doctor v. Turner*, 251 Mich. 175, 186-87 (1930). Use is continuous where it is exercised "more or less frequently, according to the nature of the use to which its enjoyment may be applied." *St. Cecilia Soc. v. Universal Car & Serv. Co.*, 213 Mich. 569, 577 (1921). "Mere permissive use of another's property, however, will not create a prescriptive easement." *Banach v. Lawera*, 330 Mich. 436, 440-41 (1951). Conrail argues that it has openly and notoriously treated the Spur as its

own since 1954, thus shifting the burden to produce evidence that the use was merely permissive.

Conrail's use of the Spur can be split up into several distinct phases. From 1954-1996, when the Facility was active, Conrail used the Spur daily to deliver coke to McLouth. From 1996-2003, it used the Spur for less frequent rail deliveries. From 2003-2012, it asserts that it accessed the Spur twice per year to kill vegetation on the track; however, WJRC disputes this fact.[6] (DE 37-3 at 6.) Conrail also points to the fact that its affiliate marketed the ability to use the Spur for rail deliveries to the Facility, indicating that its use was open, notorious, and hostile to McLouth.

The fact that Conrail openly and continuously used the Spur during the first period appears to be undisputed. However, the parties disagree on whether that use was permissive, and point to conflicting evidence to demonstrate their positions. First, the parties each rely on the testimony of Conrail's 30(b)(6) designee, David Ziccardi. WJRC points to the following portion of his deposition testimony:

> Q.  To your knowledge, did Conrail or any of the other predecessors at any time during McLouth's ownership of the property

---

[6] Conrail points to the deposition of Rodney Lappin, who testified to twice annual weed spaying at the Spur. (DE 37-3 at 6.) West Jefferson contends that there is no evidence to demonstrate that Conrail actively kept the Spur clear of vegetation, and points to the testimony of Conrail employee Thomas Szpond, who indicated that the brush at the Spur needed to be cut down in 2015. (DE 48-3 at 20; *see also* Joint Statement of Disputed/Undisputed Material Facts, DE 64 at § III, ¶ 21.)

where the rail spur is located use the spur without McLouth's consent?

A.     Without McLouth's consent?

Q.     Yes.

A.     I don't have any knowledge of that happening.

(DE 27-1 at 24.)  According to WJRC, this establishes that Conrail's use of the

Spur was permissive.  Conrail counters that Mr. Ziccardi also testified to Conrail's

ownership of the Spur, stating the following:

Q.     Okay. So as far as you know, Conrail and its predecessors had permission from McLouth to use the spur on West Jefferson Railroad's property during the period of time that McLouth owned the property?

A.     Yes - - well, I know that *they didn't object*. *My belief* is that we owned this track so we didn't need their permission to use our own track.  We used it to provide service, the service that they requested.

(DE 47-5 at 3 (emphasis added.))  Mr. Ziccardi's second statement seems to

contradict, or at best clarify his first: according to him, McLouth's permission was

assumed but perhaps irrelevant, because Conrail owned the Spur track.  Much of

Conrail's evidence supports this reading of the testimony, such as the fact that it

entered into an agreement with Ironton for use of the Spur, including the payment

of annual rent. (DE 31-10.) [7]   WJRC does not dispute that the Ironton agreement

---

[7] See also, e.g., DE 34-3 and 34-4 (unsigned agreements between Conrail and Detroit Steel, which presume that Conrail is the owner of the Spur), DE 34-5 (Trenton Land Holding's application to Conrail for use of the Spur), and DE 31-3

exists, but argues that it has no bearing on whether or not the use was permissive because McLouth was not a party to that agreement.

The parties also disagree as to who built the Spur. Conrail points to a 1963 agreement stating that its predecessor had "borne the entire cost of building, operating and maintaining the bridge and track . . . ." (DE 31-10.) WJRC counters that a 1954 agreement refers only to the building of a *bridge*, along with McLouth's statements to the City of Trenton describing the Spur as "McLouth Steel Corporation's existing Hi-Line track." (DE 27-2 at 27, DE 27-1 at 89-111.) In any case, the Court notes that neither Mr. Ziccardi's "belief" nor Conrail's acceptance of rent payments from a third party create legal rights over the Spur, as both could be premised on mistaken facts.

Based on the foregoing, the parties have each adduced evidence demonstrating their positions and essentially ask the Court to weigh the conflicting evidence in their favor, which is inconsistent with the standard for granting summary judgment to either side. While there is some merit to WJRC's argument that Conrail has the more substantial burden of proving its hostile use by clear and

at 2-3 (testimony of the Conrail's Industrial Development Manager as to the marketing of the Spur to customers).

cogent evidence, neither side has demonstrated that it is entitled to judgment as a matter of law without a trial on the record submitted.[8]

### d. Prescriptive Easement – 1996 to 2011

Conrail offers an alternative argument, asserting that even if it only had revocable permission *from McLouth* to use the Spur, the permission was revoked when McLouth conveyed the property to Hamlin Holdings as part of its 1996 bankruptcy. (DE 33-7.); *Burkhart v. Zimmerman*, 239 Mich. 491, 493-94 (1927) ("[A] conveyance of land by the licensor *ipso facto* operates as a revocation of a license previously granted"). Again, in order to establish a prescriptive easement, Conrail must demonstrate by clear and cogent evidence that its use of the Spur was open, notorious, adverse, and continuous for 15 years. *Prose*, 242 Mich. App. at 679; *Matthews*, 288 Mich. App. at 37. Conrail asserts that its actions in making deliveries to DSC, along with its maintenance and marketing of the Spur between 1996 and 2012, were open, notorious, and continuous. It relies upon the testimony of Rodney Lappin, who sprayed the Spur for weeds from "the 1990s through 2012," to support its position that it "used" the Spur even after it stopped making deliveries to the Facility. (DE 52-8 at 3.)

WJRC contends that Conrail cannot meet the 15 year requirement because its *rail activity* over the Spur lasted only from 1997 to 2003. It argues that

---

[8] The parties were asked if they wanted to convert these motions into a trial on the briefs, but they declined. (DE 59, 62, and 63.)

Conrail's twice-yearly weed maintenance of the Spur from 2003 through 2011, if it even occurred, was not open, visible, and notorious because the Spur is in a wooded area that cannot be seen from the adjacent office building. To support this conclusion, WJRC points to the deposition of Eric R. Fritz, its president, who testified that he did not "recall any, seeing any" use of the Spur prior to the initiation of the lawsuit, noting that the track was blocked from view of the office by trees and a wooded area. (DE 48-6 at 11.)[9] WJRC likens it to the situation in *Doctor v. Turner*, 251 Mich. 175 (Mich. 1930), in which the court held that the plaintiffs' annual hay cutting was insufficient to be "so open, visible and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally and with a purpose to assert a claim of title adversely to his, or so patent that the owner could not be deceived, and such that if he remains in ignorance it is his own fault." *Id.* at 187 (internal quotation omitted). Conrail counters that anyone who walked the Spur would see the *result* of the maintenance.[10]

The *Doctor v. Turner* case is helpful to consider. There, the issue was not decided at the summary judgment stage. Instead, witnesses were called during the trial to testify as to the impact of the annual hay cutting of the subject property. 251

[9] This is plausible, in light of the Court's on-site inspection of the Spur.

[10] The Court has no idea what its condition was between 1996 and 2012, but today it appears to be overgrown with weeds.

Mich. at 183.  Likewise, here, the impact of Conrail's weed cutting on the Spur is a question of fact that is not appropriate for decision at the summary judgment stage. Each of the parties points to conflicting evidence on this issue, with Conrail relying on the deposition of a Conrail employee who testified to twice-annual weed spraying and WJRC relying on the testimony of another Conrail employee who indicated that the Spur was overgrown.  (*See* the parties' Joint Statement of Disputed/Undisputed Material Facts, DE 64 at § III, ¶ 21.)  Moreover, and unlike the farmer in *Turner*, it is hardly a given that eradicating weeds on a train track may constitute sufficient "use" for our purpose here.  Again, the parties present opposing evidence and ask the Court to weigh it and award one of them judgment as a matter of law.  However, in deciding a motion for summary judgment under Rule 56, the "court is not to weigh evidence" because "summary judgment 'will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  *Smith v. Campbell*, 250 F. 3d 1032, 1036 (6th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).  Here, depending on the testimony offered at trial, a reasonable factfinder could return a verdict that the twice yearly weed maintenance was not sufficient to be considered open and notorious use of the Spur.  Or, it could find the opposite to be true. Accordingly, I recommend that the Court decline to grant summary judgment on this issue.

## 2.     Intended but Imperfectly Created Easement

Conrail next argues that it is entitled to summary judgment because it holds an intended but imperfectly created easement.  It asserts that Conrail and McLouth's actions reflected "a mutual intent to create an easement for Conrail to construct, maintain, and use the Spur." (DE 31 at 31.)  To support this assertion, Conrail points to the fact that it constructed the Spur (a fact which WJRC disputes), asserting that the "reasonable inference" to be drawn is that it incurred the construction expense "based on an agreement that it would hold an irrevocable right to use the track it constructed."  (DE 31 at 32.)  No executed agreement to that effect has been produced.  Conrail also notes that it moved freight over the Spur for decades *without a written agreement* with McLouth and contracted with other railroads for use of the Spur. (DE 31 at 32.)  It points to the Draft Agreement as confirming the existence of an easement.  (Id; *see also* DE 32-4.)

WJRC directs the Court to the two cases in Michigan where implied but imperfectly created easements have been found.  In the first, *Prose*, 242 Mich. App. 676, there existed an express easement between the parties.  The plaintiffs brought suit over their ability to use one area of the building covered by the easement for loading and unloading vehicles, which was not expressly laid out in the easement.  The court concluded that the evidence showed that use of the subject property for loading and unloading "was performed within the easement

area pursuant to the mistaken believe that the 1971 express easement permitted such activity." *Id*. at 684.

In the second case, *Mulcay v. Verhines*, 276 Mich. App. 693 (2007), the owners of half of a lot brought suit against the owners of the other half, seeking an easement along the center line to prevent the defendants from blocking access to the plaintiff's property. *Id*. at 693. In that case, the original owner of the property, William Verhines, had prepared such an easement, relayed to the city that he would sign it, was granted the right to split his property on that basis, and then never actually executed the easement. The court held that these facts were sufficient to create an implied easement, noting that without them it "might simply conclude that William Verhines consciously decided not to execute the easement . . . ." *Id.* at 701.

Here, Conrail presents no evidence of an express but misunderstood easement, as was the case in *Prose*. Nor does it have evidence of an intended easement. To the extent that it relies on the Draft Agreement, it is distinguishable from the situation in *Mulcahy* because there is no evidence of McLouth's *intention* to execute the agreement. (DE 32-4.) Conrail's own representative, Mr. Ziccardi, testified that he had "no idea" who drafted the document, who presented it to whom, or anything else about the intentions surrounding the unsigned Draft Agreement. (DE 27-1 at 33.) The parties are only guessing at the fact that it was

created after 1968 based on context clues in the document referring to a merger that occurred that year.  (Id.)  This situation is more analogous to the *Mulcahy* court's explanation that, absent express evidence of the property owner's *intention* to create an easement, the court should not read one in.  *See also Forge v. Smith*, 458 Mich. 198, 205 (1998) ("In order to create an express easement, there must be language in the writing manifesting a clear intent to create a servitude.  Any ambiguities are resolved in favor of the use of the land free of easements.").

Likewise, Conrail's assertion that the only reasonable inference to be drawn from the fact that it constructed the Spur is that the parties intended that it would hold an irrevocable right to the same is incorrect.  First, reasonable inferences, without more, are not sufficient evidence to demonstrate that a party is entitled to summary judgment under the clear and cogent evidence standard.  *McQueen*, 168 Mich. App. at 645 n.2 (in an adverse possession case, if "there is any reasonable dispute, in light of the evidence, over the question of possession, the party has failed to meet his burden of proof.").  Second, the testimony of Conrail's representative, Mr. Ziccardi, reveals that Conrail *would* provide service *without an express agreement* when "the business is worth it," indicating that there is more than one reasonable inference that can be drawn.  (DE 27-1 at 41.)  Indeed, logic suggests that it may well behoove a freight carrier to construct the means of ingress to its customer's property at the carrier's own expense if there is substantial long-

term profit to be made on the delivery of the freight itself. In business parlance, this is analogous to a "loss leader," in which a seller gives away something at the front-end in order to draw customers going forward, in this case the inference being that "if the freight carrier builds it, the steel plant will use that freight carrier to ship both its raw materials and its finished products." It is difficult, to say the least, to use a railroad company's services within one's own plant complex without track. In sum, there is no evidence that the parties clearly intended to create an easement, and I recommend that the Court deny Conrail's motion for summary judgment and grant WJRC's motion on this issue.

### 3.     WJRC's Status as a Railroad

The Court must next determine whether the Railroad Code of 1993 ("Railroad Code") includes WJRC's operations within its definition of "railroad." Statutory construction is a question of law. *In re MCI*, 460 Mich. 396, 413 (1999). In analyzing this matter, "[t]he fundamental rule of statutory construction is to give effect to the Legislature's intent." *Farrington v. Total Petroleum, Inc.*, 442 Mich. 201, 212 (1993). "If the statutory language is clear and unambiguous, then we conclude that the Legislature intended the meaning it clearly and unambiguously expressed, and the statute is enforced as written. *Huggett v. Dep't of Nat. Res.*, 464 Mich. 711, 717 (2001); *Helmsley v. City of Detroit*, 380 F.2d 169, 171 (6th Cir. 1967) (noting that "Federal Courts are bound by the law of Michigan and the

decisions of its courts construing it" and "decisions of State Courts on matters of state statutory interpretation . . . must guide the federal judiciary."); *see also United States v. Neering*, 194 F. Supp. 2d 620, 626 (E.D. Mich. 2002) (citing *Huggett*'s analysis of statutory construction under Michigan law); *Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608, 611 (6th Cir. 2014) ("Under Michigan law, statutory interpretation requires an examination of the plain language of the statute.").

### a. Conrail's Reading – *Ejusdem Generis*

Under the Michigan Railroad Code, a "railroad . . . shall not, except for crossing, take the track or right-of-way *of any other railroad company*." Mich. Comp. Laws § 462.241 (emphasis added). Conrail asserts that this provision does not prevent it from taking any track or right-of-way belonging to WJRC, because WJRC does not qualify as a railroad under the Code, which defines "railroad" as:

> a person, partnership, association, or corporation, their respective lessees, trustees, or receivers, appointed by a court, or other legal entity operating in this state either as a common carrier for hire or for private use as a carrier of persons or property upon cars operated upon stationary rails and includes any person, partnership, association, corporation, trustee, or receiver appointed by a court *or any other legal entity owning railroad tracks*.

Mich. Comp. Laws § 462.109(1) (emphasis added).

Conrail argues that WJRC is a sham company that is not entitled to claim the statutory status of "railroad" simply because it is a "legal entity owning railroad

tracks." It urges the Court to apply the doctrine of *ejusdem generis* in reading the

Railroad Code, which Michigan courts have utilized "frequently in defining the

scope of a broad term following a series of specific items." *Weakland v. Toledo*

*Eng'g Co.*, 467 Mich. 344, 349 (2003). Under this doctrine, "'the general term is

restricted to include only things of the same kind, class, character, or nature as

those specifically enumerated'; that is, because the listed items have a

commonality, the general term is taken as sharing it." *Id.* at 349-350 (quoting

*Huggett*, 464 Mich. at 718-19). As applied to the Railroad Code, Conrail asserts

that the general phrase "any other legal entity owning railroad tracks" follows the

specific identification of two types of rail carriers: (1) those for hire as a common

carrier; or (2) those for private use as a carrier of persons or property. As such, to

be considered a railroad, any legal entity owning railroad tracks must operate

either: (1) for hire as a common carrier; or, (2) for private use as a carrier of

persons or property.

WJRC contends that, if the definition required *operation* to qualify as a

railroad, then the following underlined portion of the definition could be stricken

without impacting the definition of railroad:

> a person, partnership, association, or corporation, their respective
> lessees, trustees, or receivers, appointed by a court, or other legal
> entity operating in this state either as a common carrier for hire or for
> private use as a carrier of persons or property upon cars operated upon
> stationary rails <u>and includes any person, partnership, association,</u>

> corporation, trustee, or receiver appointed by a court or any other
> legal entity owning railroad tracks.

Mich. Comp. Laws § 462.109(1).  It argues that the Court must avoid a reading of the statute that renders part of it as surplusage.  *See Huggett*, 464 Mich. at 721.

### b. WJRC's Reading – Plain Language

WJRC urges the Court to instead utilize a plain language reading of the statute, asserting that the statutory language is clear and unambiguous.  According to WJRC, the Railroad Code breaks "railroads" into two groups.  The first consists of "a person, partnership, association, or corporation, their respective lessees, trustees, or receivers, appointed by a court, or other legal entity operating in this state either as a common carrier for hire or for private use as a carrier of persons or property upon stationary rails . . . ."  The second group consists of "any person, partnership, association, corporation, trustee, or receiver appointed by a court or any other legal entity owning railroad tracks."  In other words, one group includes *carriers* while the other includes *owners* of railroad tracks. WJRC argues that this grouping reflects a policy choice by the Michigan Legislature to include within the definition of "railroad" companies that own track and lease it to another railroad.

Conrail also makes a "surplusage" argument with respect to WJRC's reading, arguing that it would violate the principle of statutory interpretation that "[e]very word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible."  *Baker v. Gen. Motors Corp.*,

409 Mich 639, 665 (1980). According to Conrail, if "any entity owning track" is the only qualification needed to be defined as a railroad, then all of the language preceding that clause would be unnecessary. However, WJRC's above explanation actually renders this argument moot. Specifically, limiting the statute only to "any entity owning track" would eliminate lessees, and potentially Conrail, from the definition of "railroad."

I conclude that WJRC's reading of the Railroad Code under the plain language method of statutory interpretation is the most accurate. The Railroad Code breaks those entities defined as "railroads" into two groups: (1) those operating a carrier; and, (2) those owning railroad tracks. The *ejusdem generis* method applies only where a specific list is followed by a general term, where the general term "is restricted to include only things of the same kind, class, character, or nature as those specifically enumerated." *Hugget*, 464 Mich. at 718-719. The statute at issue in *Hugget* is helpful in demonstrating its application. There, the Natural Resources and Environmental Protection Act prohibited certain activities in wetlands. However, certain farming activities were exempted from compliance with the act. Those activities were set out in the statute as follows:

> (e) Farming, horticulture, silviculture, lumbering, and ranching activities, including plowing, irrigation, irrigation ditching, seeding, cultivating, minor drainage, harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices. Wetland altered under this subdivision shall not be used for

a purpose other than a purpose described in this subsection without a permit from the department.

*Hugget*, 464 Mich. at 716 (quoting Mich. Comp. Laws § 324.30305). The statute clearly sets out the general terms of "[f]arming, horticulture, silviculture, lumbering, and ranching activities," followed by a specific list of activities "included" within the definition. Here, as WJRC correctly argues, the reference to "any other legal entity owning railroad tracks" is not a general term but instead is one of two types of the groups included within the definition.

I also note that the statute uses the word 'and' before the clause relating to the ownership of railroad tracks. The word *and* is conjunctive, and signifies one thing being "*in addition* to something else," as opposed to "*instead* of [disjunctive] something else" or as "*a part of* or *included within* something else." Conrail's reading of the word *and* would give it the meaning "which," i.e., "which includes." This is more akin to "included within" than "in addition to," and is consequently rejected.

This reading is also consistent with another provision of the Railroad Code, which states that "[o]ne or more persons may form a corporation *for the purpose of* constructing, operating, and maintaining a railroad . . .," and which does not distinguish between entities formed "for the purpose of operating a railroad" and those "currently or actually" operating a railroad, even if no such railroad is in operation at the time of the entity's formation. Mich. Comp. Laws § 462.201(1)

(emphasis added); *see also Farrington*, 442 Mich. at 209 ("it is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature."). As such, I conclude that Conrail is not entitled to partial summary judgment on Count II of its complaint; however, neither is WJRC entitled to summary judgment on this issue because, as explained immediately below, the question of whether it "owns railroad tracks" appears to be in dispute.

### 4. Fixtures versus Trade Fixtures

WJRC argues that the Spur is a fixture, and was therefore included in any conveyances of the subject property. Conrail counters that even if WJRC is considered a railroad under the statute, it is irrelevant because it does not own the Spur and Conrail can still acquire its easement through condemnation proceedings. Specifically, Conrail asserts that the track which sits on the subject property is a trade fixture that remains the property of the affixing party. Put another way, Conrail argues that the Spur is its personal property (and thus presumably subject to removal), and WJRC argues that it is a permanent part of the subject property.

Under Michigan law, "whatever is affixed to the realty becomes part of the realty." *Wayne Cty. V. William G. Britton & Virginia M. Britton Tr.*, 454 Mich. 608, 622 (1997). As such, a fixture is treated as real property. In Michigan, property is a fixture if the following three criteria exist: (1) actual or constructive

annexation to the realty; (2) "adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated;" and, (3) the "intention to make the article a permanent accession to the freehold." *Id.* at 615. The parties only dispute the third factor in this analysis. (DE 47 at 29.)

A trade fixture, on the other hand, "is merely a fixture which has been annexed to leased realty by a lessee for the purpose of enabling him to engage in a business" and is considered to be "personal property of the lessee." *Outdoor Sys. Advert., Inc. v. Korth*, 238 Mich. App. 664, 667-68 (1999) (internal citations and quotations omitted). "A chattel is a trade fixture if devoted to a trade purpose, regardless of its form or size." *Id.* at 668. Determining whether an item is a trade fixture is a mixed question of law and fact. *Id.* In the *Wiggins* case, the court cited with approval a case finding railroad tracks to be trade fixtures where "the surrounding circumstances showed that at the time the rails were laid upon the land it was not intended that they should be merged in the freehold." *Wiggins Ferry Co. v. Ohio M. Ry. Co.*, 142 U.S. 396, 416 (1892).

Applying the foregoing authority, therefore, the Court is being asked to determine the parties' intent when the Spur was built, based on the surrounding circumstances. This is a disputed question of fact and therefore summary judgment should not be granted on this issue. Conrail argues that the intent could not have been for the Spur, which it built, to become a fixture, and again points to

the *unsigned Draft Agreement* as evidence that "[i]f either Conrail or McLouth intended for the Spur to run with the land there would have been no need for McLouth to negotiate for its purchase." (DE 47 at 30.) However, the parties, both in their briefing and in their joint list of disputed facts, disagree on the significance of the unsigned Draft Agreement, as it is unclear who created the document, for what purpose, or whether McLouth ever ascribed to it. (DE 64 at § III, ¶ 24.) Moreover, WJRC disputes Conrail's assertion that it built the Spur in the first place. Likewise, WJRC argues that McLouth's intent in purchasing the subject property was to provide a rail connection, which required a track, demonstrates its further intention that the Spur was to become a permanent accession to the property. A reasonable factfinder weighing these facts could come out either way.

WJRC also points out that Conrail took a contrary legal position in *Consolidated Rail Corp. v. Grand Trunk W.R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *11 (E.D. Mich. Oct. 22, 2009), where Conrail argued that the railway tracks in that instance were fixtures. WJRC seems to be offering this as evidence against Conrail's current argument that the rail at issue here is not a fixture. However, the position taken by Conrail in that completely separate case has no dispositive effect in the instant matter. As addressed above, the determination of whether a railway is a fixture or personal property is fact dependent, and is a mixed question of law and fact. *Outdoor Sys. Advert., Inc.*, 238 Mich. App. at 668; s*ee*

*also, e.g., Appeal of Morgan*, 39 Mich. 675, 676 (1878) (finding that "the superstructure of a railroad is a fixture"); *Galveston, H. & H.R. Co. v. Cowdrey*, 78 U.S. 459, 482 (1870) (finding that "the rails put down on the company's road became a part of the road" and therefore were "fixtures."); and *Oman v. Bedford-Bowling Green Stone Co.*, 134 F. 64, 68 (6th Cir. 1905) (finding that the "rails, ties, etc., constituting the tracks, were held by the railroad company as personal property" because they were not "so immovably attached to the soil as to put it beyond the power of the [new landowner] to treat them as it might see fit.").  The 2009 case did not involve the instant Spur or WJRC, and was decided at the motion to dismiss stage.  There has been no showing that this unrelated case could somehow estop Conrail from pursuing its present argument here, nor would *res judicata* apply, the parties being different, and not in privity with the current parties.  *Bates v. Twp. of Van Buren*, 459 F. 3d 731, 734 (6th Cir. 2006).  Conrail's argument in that matter has no bearing on the instant case.  Accordingly, I recommend that the Court decline to grant summary judgment to WJRC on this basis because reasonable disputes of material fact exist as to whether the Spur is personal property or realty.

### D. <u>Conclusion</u>

In sum, I recommend that the Court **GRANT IN PART AND DENY IN PART** both motions for summary judgment.  Specifically, I recommend that the

Court grant Conrail's motion to the extent that it is entitled to pursue its prescriptive use theory as part of its quiet title claim, and recommend that the Court deny the remainder of its motion. I recommend that the Court grant WJRC's motion to the extent that it is entitled to summary judgment on Conrail's intended but imperfectly created easement argument, and that it deny the motion in all other respects.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.


Dated: August 9, 2017                    s/Anthony P. Patti
                                         Anthony P. Patti
                                         UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on August 9, 2017, electronically and/or by U.S. Mail.

                                         s/Michael Williams
                                         Case Manager for the
                                         Honorable Anthony P. Patti